UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| VOLVO GROUP NORTH AMERICA, LLC d/b/a VOLVO TRUCKS NORTH AMERICA, a Delaware limited liability company, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| and | ) Civil Action No. 7:18-cv-00043-EKD |
| KENWORTH TRUCK COMPANY, a Division of PACCAR INC., a Washington corporation, | )<br>)<br>)<br>)<br>) |
| Plaintiff-in-Intervention, | )<br>) |
| v. | )<br>) |
| TRUCK ENTERPRISES, INC., a Virginia corporation; JAMES E. HARTMAN; TRUCK ENTERPRISES ROANOKE, INC., a Virginia corporation; TRUCK ENTERPRISES LYNCHBURG, INC., a Virginia corporation; and TRUCK ENTERPRISES HAGERSTOWN, INC., a Virginia corporation, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER
GRANTING MOTION FOR PRELIMINARY INJUNCTION**

In a prior suit between the same parties, *Volvo Group North America, LLC v. Truck Enterprises, Inc.*, No. 7:16-cv-25 (W.D. Va.) (*Volvo I*), this court issued an opinion on cross-motions for summary judgment concerning the scope of Volvo Trucks North America, LLC's (Volvo) contractual and statutory rights of first refusal as related to a 2015 business deal between defendants and a proposed purchaser. The deal was intended to transfer ownership of defendants' truck dealerships, including Volvo dealerships. After judgment was entered in that case, defendants appealed to the United States Court of Appeals for the Fourth Circuit.

While the appeal was pending, defendants entered into a differently structured deal with the same proposed purchaser. This new agreement (the 2018 Stock Purchase Agreement or the 2018 Deal), dated January 12, 2018, is the subject of this lawsuit. Volvo filed suit and also sought preliminary injunctive relief that would stop the 2018 Deal from going forward until the court resolves the claims in this case. The parties agreed to stay discovery and to stay any contractual or statutory deadlines that would otherwise be triggered by the 2018 Deal, pending the court's decision on the preliminary injunction,[1] and the court entered their stipulated order. (Dkt. No. 11.)

After briefing and a hearing, the court stayed the case in its entirety pending a decision by the Fourth Circuit in *Volvo I*. (Dkt. No. 41.) After the Fourth Circuit issued its opinion affirming the judgment, this court lifted the stay and ordered additional briefing from the parties addressing the impact of the Fourth Circuit's decision. Those briefs are now before the court (Dkt. Nos. 43, 44), and the motion for preliminary injunction is ripe for disposition.

For the reasons discussed herein, the court will grant the motion.

## I. BACKGROUND

The parties are familiar with the factual background underlying the first case, much of which is set forth in this court's decision in *Volvo I,* No. 7:16-cv-25, Dkt. No. 111 (W.D. Va. Mar. 31, 2017), *also available at* 2017 WL 1483431. The court will first provide a brief overview of the 2018 Deal and then turn to a discussion of the court's ruling in *Volvo I.*

**A. The 2018 Stock Purchase Agreement**

Just as in the earlier case, this case arises from the proposed sale of a group of mid-

---

[1] Volvo's motion was styled as a motion for temporary restraining order and preliminary injunctive relief. (Dkt. No. 5.) Because defendants were given notice and a "fair opportunity to oppose it," including presenting evidence at the hearing and fully briefing the motion, the court treats it solely as a motion for preliminary injunction. *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006); *see also* Fed. R. Civ. P. 65(a).

Atlantic commercial-truck dealerships. Defendants Truck Enterprises, Inc., James E. Hartman, Truck Enterprises Roanoke, Inc., Truck Enterprises Lynchburg, Inc., and Truck Enterprises Hagerstown, Inc. (collectively, Dealers) own and operate commercial-truck dealerships across three states—Maryland, Virginia, and West Virginia. A number of the dealerships sell two brands of trucks and are referred to as "dualed dealerships" in the commercial-truck business. Five of the dealerships sell Volvo trucks.

The proposed buyer in this case is also the same. That is, Dealers wish to sell all of their dealerships to non-party Transportation Equipment Company, Inc. (TEC) in a package deal. The 2018 Stock Purchase Agreement provides that TEC will purchase 100% of the capital stock in defendants' heavy and medium-duty Kenworth, Volvo Trucks, and Isuzu businesses. (Stock Purchase Agreement, Compl. Ex. 5, Dkt. Nos. 1-5 to 1-7.) It allows Volvo to purchase Volvo businesses and assets and, if Volvo does so, then converts that portion of the sale from a stock sale into an asset sale. Also, in order to account for the tax consequences to defendants of an asset sale versus a stock sale, the purchase price for the Volvo assets includes an amount listed as a "Tax gross up price." (Stock Purchase Agreement, Schedule III, Dkt. No. 1-8, at 2 of 2 (redacted version).)[2]

Volvo alleges, as it did in the first suit, that the proposed sale here does not constitute a bona fide offer that would trigger Volvo's contractual and statutory rights of first refusal. While acknowledging that the deal is structured differently than the deal in *Volvo I* and that the Volvo assets are valued and separated out from the Isuzu and Kenworth assets, Volvo nonetheless contends that the new deal, as structured, is not a bona fide offer. In support of its argument, it

---

[2] Volvo refers to this provision as an impermissible "poison pill" under its agreements with defendants. Defendants point to the applicable Virginia statute, which says that the manufacturer's right of first refusal must result in the dealer's and dealer's owner's receiving the same or greater consideration as they have contracted to receive in their original deal. Va. Code § 46.2-1569. They contend that the gross up merely ensures that they receive the same amount they would have had Volvo not exercised its right of first refusal, because the exercise of this right converts a stock sale to an asset sale.

3

points to several aspects of the agreement, some of which are discussed in more detail in Section II-B-1 *infra*. For their part, Dealers argue that the 2018 Stock Purchase Agreement was specifically structured by the parties to comply with the court's holding in *Volvo I* and that it constitutes a bona fide offer.

In its motion for preliminary injunction, Volvo requests that the court order the following relief, in addition to any other relief the court "deems just and proper":

> A. Stay all contractual and statutory deadlines applicable to Volvo and its rights of first refusal until finality occurs as to . . . this Court's order relative to [Volvo's] rights as determined and declared in this proceeding; [and]
>
> B. Restrain and enjoin Defendants, their officers, shareholders, or agents, from selling and/or transferring any stock, asset or interest under the Stock Purchase Agreement, dated as of January 12, 2018, or any other contract thereafter until such time as . . . this Court's order relative to [Volvo's] rights as determined and declared in this proceeding[.]

(Pl.'s Mot. Prelim. Inj. 3, Dkt. No. 5.)

**B. The Court's Rulings in *Volvo I***

In its opinion in *Volvo I*, the court analyzed Volvo's contractual and statutory rights of first refusal with regard to the 2015 Deal. Because exactly the same statutes and agreements between Volvo and Dealers govern both the 2015 and 2018 Deals, and because the court's analysis in that case also governs here, the court discusses its prior ruling in some detail.

Volvo's contractual rights of first refusal stem from various Dealer Sales & Service Agreements (the Dealership Agreement(s)) that it entered into with Dealers, which appoint the Dealers as authorized dealers of Volvo Trucks and govern the relationships between the Dealers and Volvo. In its *Volvo I* opinion on summary judgment, the court first noted that Section 9.3.1 of the Dealership Agreement grants "'the Company'"—that is, Volvo—'a right of first refusal for any bona fide Dealership Transfer offer (the 'Offer').'" *Volvo I*, 2017 WL 1483431, at *4.

4

The section also describes what exactly constitutes a bona fide offer:

> To be a bona fide Offer that is valid upon Company, the Offer shall: include all material terms and conditions that enable Company to know the value of the Company assets to be sold. **A submission of proposed sale terms that are co-mingled with other assets of Dealer shall not constitute a bona fide Offer that is valid upon Company.**

*Id.* at *4–*5 (citing Dealership Agreement 47–48) (emphasis added). By definition, then, an "offer" cannot include Volvo assets co-mingled with Dealer assets. *Id.* Section 9.3.5 of the agreement states that "signing an agreement not subject to the Company's rights under [Article 9]" constitutes a breach of the agreement. *Id.* at *5. The court explained that "[t]he clear intent of these sections is for Volvo's right of first refusal to encumber 'Company assets.'" *Id.*

The court next reasoned that each Dealership Agreement explains how to analyze whether a proposal is a bona fide offer or not:

> "[T]he first question when an offer is made is whether the offer 'include[s] all material terms and conditions that enable Company to know the value of the Company assets to be sold,' and whether it 'co-mingles' those assets with 'other assets of Dealer.'" ([Dealership Agreement] 47–48). If the purchase agreement lets Volvo know the value of "Company assets" and does not comingle, it is a bona fide offer, and Sections 9.3.2 and 9.3.3 explain how Volvo can exercise its right of first refusal. Otherwise, if the agreement is not a bona fide offer, then it is "an agreement not subject to the Company's rights under [Article 9]," and Section 9.3.5 provides Volvo remedies. Under this scheme the opportunity to step into the shoes of a prospective buyer per Section 9.3.3 arises only with respect to bona fide offers for the purchase of un-mingled "Company assets."

*Id.*

After discussing the parties' arguments, the court applied these provisions to the 2015 Deal. The court concluded that the proposed purchase agreement was a dealership transfer, but was not a bona fide offer because it did not contain "all material terms and conditions [that] enable Volvo to know the value of the Volvo assets to be sold and because the proposed sale

5

terms are co-mingled with other assets of the Dealer." *Id.* at *8. There, the problem was that the offer did not separately value Volvo assets. *Id.*

The court also went on to address the Virginia statute regarding manufacturer's rights of first refusal, Virginia Code § 46.2-1569.1. Noting the lack of case law addressing this specific provision, *Volvo I*, 2017 WL 1483431, at *9, the court nonetheless surveyed cases addressing similar statutes or issues, *id.* at *10–*13. Ultimately, the court concluded that Volvo's statutory right of first refusal also encumbers only the Volvo-related portions of Dealers' business. The court explained the practical import of its holding: "In order for manufacturers to meaningfully exercise the right, the proposal would have to include information regarding the amount of the deal allocated to each manufacturer's business before the proposal would be a completed proposal." *Id.* at *13. The court found it unnecessary to clarify the precise assets to which the right extended, but noted that a manufacturer "need not purchase portions of a dealer's business unrelated to the manufacturer." *Id.*

As a result of these rulings, the court granted in part Volvo's motion for summary judgment. Judgment was entered on April 28, 2017, *Volvo I*, Dkt. No. 117, and defendants appealed, *id.*, Dkt. No. 118.

## C. Fourth Circuit Opinion

The text of the Fourth Circuit's unpublished, per curiam opinion is brief. Its analysis is contained in a single paragraph: "After carefully reviewing the record and the order of the district court, and having had the benefit of oral argument, we agree with the district court that Volvo's right of first refusal applies to the Volvo-related assets of TEI and that TEI cannot force Volvo to expand the scope of the right of first refusal by bundling in its non-Volvo assets. We therefore affirm substantially for the reasons stated by the district court." *Volvo Grp. N. Am., LLC v. Truck Enters., Inc.*, 723 F. App'x 237 (May 25, 2018). Thus, this court's prior opinion is

6

effectively the Fourth Circuit's proclamation on these issues, and no party has shown any portion of the court's prior analysis to be in error. The court therefore applies to the 2018 Deal, to the extent they are applicable, the same legal principles it set forth in *Volvo I*. The court also notes, however, that this case involves issues not raised or addressed in *Volvo I*.

## II. DISCUSSION

### A. Legal standards[3]

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). As the Supreme Court explained in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008), a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Under the applicable standard articulated in *Winter*, the movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (quoting *Winter*, 555 U.S. at 20); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (discussing and applying *Winter* standard). All four of these requirements must be met for a plaintiff to obtain preliminary injunctive relief. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

---

[3] Unlike in *Volvo I*, Volvo does not appear to seek any mandatory injunctive relief in its motion, which "in any circumstances is disfavored." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014) (citation omitted).

**B. Volvo's Motion for Preliminary Injunction**

   **1. Likelihood of success on the merits**

The first *Winter* factor Volvo must establish is that it is likely to succeed on the merits. The first claim asserted in the complaint is a breach of contract claim based on the defendants' alleged breach of the Dealer Agreements. In particular, Volvo contends that, by entering into the 2018 Stock Purchase Agreement, Dealers breached Articles 9.3.1 and 9.3.5 of the Dealer Agreements because the 2018 Deal is not a bona fide offer. Volvo also argues that signing that agreement is a breach of Article 9.3.5 because it fails to give proper effect to Volvo's rights under Article 9. (Compl. ¶ 82, Dkt. No. 1.)

The complaint also seeks a declaration of the parties' respective rights and obligations under the statutory provisions governing rights of first refusal. But for purposes of the preliminary injunction, the court does not reach any claims based on the statute. Instead, it concludes that Volvo has shown a likelihood of success as to its breach of contract claim, and so it need not address Volvo's remaining claims.

With regard to the likelihood of Volvo's success on the merits, the issue turns on whether or not the 2018 Deal is a bona fide offer.[4] Thus, the court must consider its terms. The 2018 Deal provides that TEC will purchase 100% of the capital stock in defendants' heavy and medium-duty Kenworth, Volvo Trucks, and Isuzu business, and it also involves the sale of certain real estate and the assumption of certain real estate leases. If the sale were to go through, TEC would control all five Volvo dealerships as well as the Dealers' Kenworth and Isuzu dealerships. (Compl., Ex. 5, Stock Purchase Agreement, Dkt. No. 1-5.)

Dealers contend that the 2018 Deal complies with the instructions of the court in *Volvo I*.

---

[4] The rulings herein are only to determine whether Volvo is likely to succeed on the merits. At this point, and based on the evidence so far presented, the court believes it is likely for the reasons discussed in this section. But the court's analysis is not a final determination of the parties' respective rights and obligations.

Specifically, they state that the agreement contains "actual agreed values for the Volvo business and assets as adjusted for the tax effect of Volvo's insistence on the right to buy assets." (Defs.' Suppl. Br. 5, Dkt. No. 44.) They point out that they engaged a nationally-recognized, independent, third party accounting firm to arrive at those values, and then the Dealers and TEC agreed to those values as affected by tax considerations. (*Id.*) Those values, with one notable exception discussed below, are broken down by dealership. (Stock Purchase Agreement, Schedule III, Dkt. No. 1-8, at 2 of 2 (redacted version).)

Volvo asserts that the 2018 Deal does not comply with the court's prior ruling because it is a "package deal" in which TEC agreed to purchase everything Dealers offered to sell. Put differently, Volvo emphasizes that nowhere does TEC ever agree to buy just the Volvo dealerships and thus, Volvo is not being given the "same offer." Volvo also raises a number of other reasons why it contends that the 2018 Stock Purchase Agreement is not a bona fide offer under the Dealership Agreements and thus does not trigger Volvo's rights of first refusal.

The court first notes that the mere fact that Dealers remedied the primary deficiency of the 2015 Deal, *i.e.*, its failure to value Volvo assets separately from Isuzu and Kenworth assets, does not mean that *any* offer with separately-valued Volvo assets will constitute a bona fide offer. As noted, a number of Volvo's challenges to the 2018 Deal simply were not issues in *Volvo I*. Here, there are two aspects of the 2018 Deal that lead the court to conclude that the 2018 Stock Purchase agreement likely is not a bona fide offer and thus that Volvo is likely to succeed on the merits of its breach of contract claim.[5]

First, the agreement specifically provides that if Volvo chooses to purchase the Volvo assets, the purchase cannot proceed unless the proposed buyer, TEC, also completes its separate

---

[5] Although the court finds two aspects of the 2018 Deal defeat its status as a bona fide offer, the result would be the same even if only one of them did.

9

purchase. Specifically, Section 2.6 of the Stock Purchase Agreement states:

> If Volvo is permitted to go to Closing on the Volvo business(es) and assets, such Closing shall take place immediately prior to the Closing on the purchase of the Acquired Shares, and **completion of Closing on the Volvo business(es) and assets shall be subject to the condition subsequent of completion of Closing on the Acquired Shares. If Closing on the Acquired Shares is not completed, Closing on the Volvo business(es) and assets shall be null and void.**

(2018 Stock Purchase Agreement § 2.6, Dkt. No. 1-5.)

This provision contains a self-described "condition subsequent," *id.,* which conditions Volvo's ability to exercise its right of first refusal on the closing of the rest of the deal between Dealers and TEC. Thus, it effectively removes from Volvo's control its ability to fully exercise its right of first refusal. Instead of giving the power to Volvo to determine whether to purchase the Dealers' Volvo assets, then, this section allows Dealers and TEC to determine whether Volvo can do so. Effectively, this makes Volvo's right of first refusal contingent on an actions by the Dealers and the proposed purchaser.

Dealers contend, though, that the condition is necessary because they are entitled to receive "the same or greater consideration as they have contracted to receive," and "[i]f TEC does not also close on the deal," then the overall payout will be less and Mr. Hartman will not be able to sell his entire business as the offer provides. (Defs.' Opp'n Mot. Prelim. Inj. 12, Dkt. No. 12.) Dealers cite to no authority for the proposition that an offer with such a provision fulfills their obligation to offer a right of first refusal. Moreover, the deal could be structured to require TEC to purchase the non-Volvo assets; then, Mr. Hartman would be selling the entire business. But giving TEC an "out" if Volvo exercises its rights of first refusal—which then renders Volvo's purchase "null and void"—seems to the court antithetical to the very purpose of a right of first refusal. *See Keener v. Exxon Co., USA*, 32 F.3d 127, 127 (4th Cir. 1994) (describing a right of first refusal as giving its holder "an opportunity to buy the [business] on the same terms

10

as a third party offer"). Indeed, it renders the right of first refusal practically meaningless. Thus, the court concludes that Volvo has shown a likelihood of success on the grounds that this condition renders the 2018 Deal not a bona fide offer.

The second aspect of the 2018 Deal that leads the court to conclude it is not a bona fide offer is that it does not allocate the goodwill attributed to each Volvo franchise.[6] Although it sets forth a different price for each of the five Volvo dealerships with regard to Volvo assets, it contains a combined price tag for the "goodwill" attributed to all five. (Stock Purchase Agreement, Schedule III, Dkt. No. 1-8 at 2 of 2 (redacted version) (containing one figure for all five dealerships as to "intangible assets"); *id.* § 2.2, Dkt. No. 1-5 (defining "Volvo intangible assets").) Volvo, however, has four separate (although substantially identical) Dealership Agreements and thus four separate rights of refusal. (Dealer Agreements, Compl., Exs. 7–10, Dkt. Nos. 1-9 to 1-12.)[7] Volvo must be able to exercise those rights independently and know the amount it is paying for the dealerships in each Dealership Agreement so that it can determine— for each one—whether it wants to exercise its right of first refusal.[8] The court agrees with Volvo's argument on this point:

> Volvo has the right to exercise its ROFR on one, two, three, or all four of the Dealer Agreements or to any combination of those four. Nothing in the Dealer Agreements requires that Volvo exercise its ROFR as to all Dealer Agreements or else forego its ROFR right under each Dealer Agreement. Likewise, nothing in Virginia law requires that Volvo exercise its statutory ROFR as to all Volvo locations. For instance, consistent with Virginia law, should Volvo elect to exercise its ROFR as to one Dealer Agreement (e.g., the

---

[6] The separation of different Volvo dealerships for valuation purposes was not raised in *Volvo I*, and so the court's opinion did not address it.

[7] Although Dealers collectively have five dealership locations that sell Volvo trucks, it has only four agreements. One of the Dealership Agreements includes two locations: Harrisonburg, Virginia, and Keyser, West Virginia. (Dkt. No. 1-9, at 56 of 58.)

[8] Volvo also contends that "goodwill" is not a value that Volvo has to pay, but it reasons that "because Defendants argue for such payment, they must abide by the Dealer Agreements and segregate the amount" by dealership. (Pl.'s Reply Br. 10 n.5, Dkt. No. 21.)

11

> Dealer Agreement involving the Harrisonburg, Virginia location and the Keyser, West Virginia sub-dealer location), Volvo's contractual and statutory obligation is to pay the "same or greater consideration" Defendants[] contracted to receive from a buyer as to each of those two locations.

(Pl.'s Reply Br. 10, Dkt. No. 21.)

For these reasons, the court concludes that the 2018 Stock Purchase Agreement likely is not a bona fide offer under the Dealership Agreements and thus that Volvo has clearly shown a likelihood of success on the merits, at least as to its breach of contract claim.[9]

### 2. Irreparable Harm

To obtain injunctive relief, Volvo must also show that it will likely suffer irreparable harm in the absence of a preliminary injunction. *Winter*, 555 U.S. at 20. For the same reasons the court found irreparable harm in the earlier case, the court believes that Volvo can establish irreparable harm here, as well. That is, allowing the 2018 Deal to go forward, when it likely is not a bona fide offer, would force Volvo to exercise those rights before the court can determine if the 2018 Deal is a bona fide offer or miss out on the opportunity to do so, thereby losing its rights of first refusal. Given the ongoing harm that would occur as a result of either of those scenarios, it would be difficult—if not impossible—to calculate a precise monetary harm as a result of either scenario. *See Mercedes-Benz USA, LLC v. Star Auto. Co.*, No. 3:11-cv-73, 2011 WL 2175037, at *2 (M.D. Ga. June 3, 2011) (finding a likelihood of irreparable harm and explaining: "If the Court were to allow the sale of [dealer's] Mercedes dealership to close, [Mercedes-Benz] would lose its right of first refusal under the Dealer Agreements. Under such circumstances, monetary damages would be difficult, if not almost impossible, to calculate.").

---

[9] As noted, the parties also dispute whether the tax gross-up referenced in Section 2.2 of the Stock Purchase Agreement constitutes either a penalty or "poison pill" that is prohibited in the Services Agreement, but in light of the court's other rulings, the court need not address that issue at this time.

### 3. Balance of the Equities

As noted in the preceding section, Volvo is likely to suffer irreparable harm absent an injunction. As to the possible harm to defendants from the issuance of an injunction, there was argument at the hearing concerning Mr. Hartman's desire to sell his dealerships so that he can retire. In Dealers' briefing, they mainly focus on their contention that there is no harm to Volvo because it is getting exactly what it asked for in the last lawsuit. (Defs.' Opp'n 21–23). The court has already explained, however, that despite the separation of most *Volvo* assets, other terms of the 2018 Deal likely mean it is not a bona fide offer.

The court acknowledges that its ruling will cause some harm to Mr. Hartman, in terms of delaying the sale of the dealerships and his possible retirement plans, and may harm the defendant businesses in that they will be managed by a reluctant owner. On the other hand, though, if—as the court believes is likely—the 2018 Stock Purchase Agreement constitutes a breach of the Dealer Agreements, then any harm to Mr. Hartman is really a result of defendants' failure to structure the 2018 Deal in a way that does not breach the agreement. For these reasons, the court concludes that the balance of equities favors Volvo.

### 4. Public Interest

The court also concludes that Volvo has established that a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20. The public has an interest in seeing contractual (and statutory) obligations enforced, *see Mercedes-Benz USA*, 2011 WL 2175037, at *3, and the court's injunction—which will maintain the status quo until the court can fully resolve the issues—will serve that purpose.

## C. Volvo must post a security bond.

As it did in the last case, the court will require Volvo to post a security bond in the amount of $100,000. Under Federal Rule of Civil Procedure 65(c), a court may issue a

preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The "court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013).

As it explained in *Volvo I*, the court believes that this amount will be sufficient to cover whatever losses Dealers may suffer during the pendency of the injunction, until the court can conclusively resolve the issues. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) ("The judge usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities . . . ." (citation omitted)). The court will also consider an expedited schedule to resolve the case more quickly.

The court further notes that the injunction does not place any restrictions on Dealers' operation of the dealerships. Dealers are therefore able to continue to run the dealerships as they do now during the pendency of the injunction.

### III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Volvo's motion for preliminary injunction (Dkt. No. 5) is GRANTED as to Volvo's request to stay the proposed sale of the dealerships and suspend the running of any deadlines triggered by a bona fide offer. It is further ORDERED as follows:

1. Defendants are PRELIMINARILY ENJOINED from selling and/or transferring any stock, asset, or interest in Truck Enterprises, Inc., Truck Enterprises Roanoke, Inc., Truck Enterprises Lynchburg, Inc., and/or Truck Enterprises Hagerstown, Inc., under the terms of the January 12, 2018 Stock Purchase Agreement between Truck Enterprises, Inc. (represented by

14

James Hartman, as Chief Executive Officer, Chairman, and Shareholder Representative of TEI) and non-party Transportation Equipment Company, Inc.;

2. The statutory and contractual time periods within which Volvo must exercise any statutory and contractual rights of first refusal are SUSPENDED and STAYED pending the court's decision on the merits of Volvo's claims in this case;

3. Nothing in this Order shall prohibit defendants from continuing normal dealership operations;

4. Volvo shall post a certified surety bond in the amount of $100,000 on or before 4:00 p.m. on October 5, 2018, pursuant to Federal Rule of Civil Procedure 65(c); and

5. The preliminary injunction shall issue and take effect on Volvo's posting of the required bond with the clerk and will remain in effect until further order of this Court.

The clerk is directed to send a copy of this memorandum opinion and order to all counsel of record.

Entered: September 30, 2018.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge